Mary Louise Cohen
DC Bar # 298299
Colette G. Matzzie
DC Bar # 451230
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C. 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>EX REL. STEPHEN M. SHEA and )<br>2PROBE LLC )<br>56 Heermance Place )<br>Suite 300 )<br>Ridgewood, NJ 07450, )<br> )<br>    Plaintiffs, )<br>v. )<br> )<br>Verizon Communications Inc. )<br>140 West Street )<br>New York, NY, )<br> )<br>    Defendant. )<br>_____ ) | C<br><br>CASE NUMBER  1:07CV00111<br><br>JUDGE: Gladys Kessler<br><br>DECK TYPE: General Civil<br><br>DATE STAMP: 01/17/2007<br><br><br>FILED UNDER SEAL<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729 et seq

Plaintiffs Stephen M. Shea and 2Probe LLC alleges, on behalf of the United States of

America, for his Complaint against defendant Verizon Communications Inc,. alleges, based upon

personal knowledge and relevant documents, as follows.

### I.   INTRODUCTION

1.   This is an action to recover damages and civil penalties on behalf of the

United States of America arising from false and/or fraudulent records, statements and claims

made, used and caused to be made, used or presented by defendant and/or its agents, employees

and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 et seq., as amended ("the FCA" or "the Act").

2.     This action concerns the knowing submission to the United States of certain prohibited surcharges under contracts to provide telecommunication services between defendant Verizon Communications Inc (and its division Verizon Business) and the General Services Administration.

3.     In 2006 Verizon Communications Inc. merged with MCI, Inc. and assumed responsibilities that MCI had under its contract to provide telecommunication services under the FTS2001 Contract.   In addition, in July 2006 Verizon Communications, Inc. entered into the FTS2001 Bridge Contract with GSA to provide continued telecommunication services to federal agencies, entities and components.

4.     The knowing submission of overcharges began in at least 1999 with MCI's administration of the FTS2001 Contract for telecommunication services with the General Services Administration, Contract No. GS00T99NRD2002. MCI overcharged the United States by submitting invoices for payment to the United States for certain surcharges including certain federal, state and local taxes that it is prohibited from charging the United States under Federal Acquisition Regulations (FAR) and the FTS2001 Contract. In addition, MCI systematically overcharged the United States by submitting invoices for these taxes, surcharges, and duties under the FTS2001 Contract that are inflated above any charge that MCI had incurred and by bundling these taxes, surcharges and duties into line items on the invoices which conceal the true nature of the charges.

5.     In 2006, Verizon Communication Inc. merged with MCI, Inc. and assumed responsibility under the FTS2001 Contract for providing telecommunication services to the

United States.

6.      Based on Relator's knowledge of and experience with the uniform billing practices implemented by the telecommunications carriers, Relator alleges, on information and belief, that Verizon continues MCI's practice of knowingly overcharging the United States by submitting invoices for payment with the prohibited surcharges.

7       The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

8.      The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

9.      The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time).  Based on these provisions, qui tam plaintiffs Stephen M. Shea and 2Probe LLC seek through this action to recover all available damages, civil penalties, and other relief.

3

10. While the precise amount of the loss to the federal and state government cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the defendant under the facts alleged in this Complaint amounts to millions of dollars.

## II.   **PARTIES**

11. Relator Stephen M. Shea is a telecommunications consultant and is the former managing director of TechCaliber LLC. Mr Shea specializes in negotiating telecommunication contracts for large commercial clients and helping to manage the costs of these telecommunication contracts for these clients. TechCaliber's client list includes many Fortune 100 companies.

Before founding TechCaliber, Relator Shea was a Senior Manager in Deloitte Consulting's networking practice. Relator Shea has managed multiple Custom Network Service Agreement (CNSA) projects, including conducting competitive procurements for new agreements, mid-term benchmarking assignments, and contract compliance reviews and he is known for his expertise in competitive analysis of tariffed and negotiated rates. Relator Shea holds a BS in Engineering Management from the United States Military Academy and an MBA from Columbia University.

12. Relator Shea discovered the false and fraudulent claims that are at issue in this case through his extensive work as a private telecommunications consultant to Fortune 100 companies including reviewing invoices to ensure that the vendors have correctly implemented the negotiated contracts. During the course of this work for private clients, Relator Shea became aware of the practice of MCI billing corporate clients not only for federal, state and local taxes levied on the customer but also for surcharges (often labeled as, or lumped together with, taxes) that were added to bills by MCI to inflate the revenue it received for telecommunication services.

13. Upon investigation, Relator Shea learned that MCI was attempting to pass on the

4

same surcharges to the United States under its FTS2001 Contract even though Federal

Acquisition Regulations (FAR) and the terms of the FTS2001 Contract precluded such

surcharges. Thus, Relator Shea has direct knowledge of the conduct alleged in this Complaint

and conducted an independent investigation to uncover false claims submitted to the United

States

14.    2Probe LLC is a limited liability corporation incorporated in Delaware in which

Relator Shea is a principal owner.

15.    Defendant Verizon Communications Inc. is one of the world's leading providers of

communication services. In 2006 Verizon Communications Inc. and MCI, Inc. closed a merger.

The business unit of Verizon that assumed government and business contracts is Verizon

Business. Verizon Business assumed MCI's responsibilities under the FTS2001 Contract upon

merger in 2006 with MCI. Verizon Communications Inc. is incorporated in Delaware and

headquartered in New York, New York.

16.    Prior to its merger with Verizon Comunications Inc., MCI had primary

responsibility for administering the FTS2001 Contract for the United States. MCI was a

Delaware corporation headquartered in Ashburn, Virginia. MCI managed one of the world's

largest communications network systems serving corporate and governmental clients in more than

200 countries. MCI was the successor corporation to WorldCom, Inc. On July 21, 2002,

WorldCom and virtually all of its U.S. subsidiaries filed voluntary petitions for relief in

bankruptcy. On October 31, 2003, a Plan of Reorganization was approved by the Bankruptcy

Court. That Plan was consummated on April 30, 2004 when WorldCom merged with and into

MCI.

## III.    JURISDICTION AND VENUE

5

17.     Jurisdiction is based on 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator, moreover, would qualify under the Act as an "original source" even if such a public disclosure were found to exist, because he has direct and independent knowledge of the wrongdoing alleged in this Complaint and because he voluntarily provided information relating to such misconduct to federal authorities prior to initiating this qui tam lawsuit.

18.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendant has minimum contacts with the United States. Moreover, the defendant can be found in or to have transacted business in the District of Columbia.

19.     Venue is proper in the District of Columbia pursuant to 31 U.S.C. § 3732(a) because the defendant can be found in and transacts or has transacted business in this district.

## IV.   BACKGROUND

### A.     APPLICABLE FEDERAL ACQUISITION REGULATIONS

20.     Federal Acquisition Regulation (FAR) 52.229-04 governs Verizon's FTS2001 Bridge Contract and governed the FTS2001 Contract with the United States. Under FAR 52.229-04, "[u]nless otherwise provided in this contract, the contract price includes all applicable Federal, States and local taxes and duties." FAR 52.229-04(b).

21.     FAR 52.229-04(a) sets forth several significant definitions that are key to construing the relevant provisions of the FTS2001 Contract.

22.     Subsection (a) defines "[a]ll applicable Federal, State and local taxes and duties" as

all taxes and duties, in effect on the contract date, that the taxing authority is imposing and collecting on the transactions or property covered by this contract."

23.     Subsection (a) also defines "excepted taxes" as "social security or other employment taxes, net income and franchise taxes, excess profits taxes, capital stock taxes, transportation taxes, unemployment compensation taxes, and property taxes." "Excepted taxes" do not include"gross income taxes levied on or measured by sales or receipts from sales, property taxes assessed on completed supplies covered by the contract, or any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is in the Government."

24.     Subsection (a) further defines "local taxes" as "taxes imposed by a possession or territory of the United States, Puerto Rico, or the Northern Mariana Islands, if the contract is performed wholly or partly in any of those areas."

25.     Subsections (c)-(h) provide a mechanism for adjusting the contract price depending on changed circumstances. Subsection c addresses adjustments for "after-imposed taxes" where the contract price did not include any contingency for such tax. Subsection d addresses adjustments for "after-relieved taxes."

26.     Subsection (g) imposes a duty to notify the United States of all matters related to any Federal excise tax or duty that reasonably may be expected to result in a change in the contract price, and sets forth a mechanism for adjustments to price.

27.     Subsection (h) requires the United States to furnish evidence, if necessary, to establish an exemption from any Federal, State or local tax when requested and when a reasonable basis for an exemption from paying the tax exists.

7

**B.    The FTS2001 Contract.**

28.    On January 11, 1999, the General Services Administration and WorldCom, Inc.

entered into Contract No. GS00T99NRD2002 ("the FTS2001 Contract") under which WorldCom

was to provide telecommunications services to the United States.

29.    The FTS2001 Contract was for an initial contract term of four years and was

renewed until negotiation of the FTS2001 Bridge Contract in 2006.

30.    MCI provided telecommunication services to the United States under the FTS2001

Contract until MCI's merger with Verizon Communications, Inc. in 2006.  At the time of the

merger, Verizon Communications, through its component Verizon Business Services, assumed

responsibility for administering the FTS2001 Contract.

31.    In mid 2006, Verizon and the GSA entered into the FTS 2001 Bridge Contract,

effective January 2007, under which Verizon Business Services is currently providing

telecommunication services to federal agencies, entities and components.  A redacted copy of the

FTS2001 Bridge Contract may be found at

http://www.verizonbusiness.com/US/govt/contracts/fts2001_bridge/redacted_contract.

**I.    Section B: Pricing Overview**

32.    Section B of the FTS2001 Contract provided a Pricing Overview.

33.    Section B.1.1 of the FTS2001 Contract stated the purpose of the "Pricing

Overview" was "to obtain price schedules for the services, related features and equipment

described in Section C."  Section B.1.1 directed that all prices shall conform to the form and

structure "defined herein" and that "[a]dditional price elements not included in the defined format

and structure are not permitted."

34.    Section B.1.2 set forth service classifications and included tables for each service

8

category (circuit-switched service, switched data services, dedicated transmission services, and value added services).

35.     Section B.1.2 further provided that "[t]he unit prices for services and features ***
shall not include domestic Federal, state or local taxes, non-domestic taxes and duties in effect
that the taxing authority is imposing and collecting on the transactions or property covered by this
contract."

36.     Section B.1.2 further provided that "[e]xcepted taxes, as defined in Federal
Acquisition Regulation (FAR) 52.229-4, shall be included in the contract price, but not itemized
on the monthly invoices."

37.     Additional provisions in the FTS2001 Contract prohibited the carrier from passing
on to the United States the cost of compliance with Federal, State and local laws except as
specified or as included within the contract price.

**ii.     Section H: Special Contract Requirements**

38.     Section H of the FTS 2001 Contract set forth "Special Contract Requirements."

39.     Section H.1 "Type and Term of Contract" stated that the FTS2001 Contract is a
"fixed price, indefinite delivery, indefinite quantity type with a type of economic price adjustment
and price redetermination" described therein.

41.     Section H.17 "State and Local Taxes" addressed "after-imposed taxes" that may be
identified by the Contractor in accordance with Federal Acquisition Regulations 52.229-04,
52.229-05, and 52-229-06 and stated that, with exceptions, the United States generally will pay
all state and local taxes applicable to telecommunication services delivered under this contract.
The exceptions were "taxes from which the Federal Government is expressly exempt under the

authorizing state statute or local ordinance" and "any state or local tax whose legal incidence is on the Federal Government."

42.     Section H.21 "Permits" directed that the carrier shall, without additional expense to the United States, be responsible for obtaining any necessary licenses, certifications, authorizations, approvals, and permits, and for complying with any Federal, state, and municipal laws, codes and regulation, and any applicable work permits, authorizations, etc. and/or visas in connection with the performance of the contract.

43.     Section H.29 "Universal Service Fund" authorized payment by the United States of two surcharges: the Federal Universal Service Fund (USF) charge and the Federal Pre-Subscribed Interexchange Carrier Charge (PICC) and any adjustments thereto.  Those two charges are "allowable surcharges" and may be charged as "separate line items."  Section H.29 specified that these items will not be treated as taxes for purposes of the FAR Clause incorporated by I.1.46.  Under this section, the carrier must provide documentation that the surcharges are fair and reasonable and limited to the pass through of the charges associated with Federal USF and PICC.

**iii.     Section I: Incorporated Contract Clauses**

44.     Section I of the FTS2001 Contract incorporated certain Federal Acquisition Regulations as terms of the Contract.

45.     Incorporated clauses included I.1.46 which incorporated FAR 52.229-04 (Federal, State and Local Taxes); Clause I.1.47 which incorporated 52.229-05 (Taxes - Contracts Performed in U.S. Possessions or Puerto Rico), and 52.229-06 (Taxes –Foreign Fixed Price Contracts). .

**iv.     Cost Proposal from Carrier**

10

46.     Volume IV of the FTS2001 Contract set forth the carrier's response to the United States' request for proposal for bids on the telecommunications contract.  Certain sections of the carrier's proposal are relevant to this action.

47.     In Volume IV, Table J.9.4, the carrier agreed to comply with each of the United States' requirements later incorporated in the contract.

48.     Volume IV, Table J.9.4 committed the carrier to "comply" with the requirement that "[t]he unit prices for services and features (as defined in the Section B pricing tables) shall not include Federal, state or local taxes, non-domestic taxes and duties in effect that the taxing authority is imposing and collecting on the transactions or property covered by this contract." B.1.2.

49.     Volume IV, Table J.9.4, committed the carrier to  "comply" with the requirement that "[e]xcepted taxes, as defined in Federal Acquisition Regulation (FAR) 52.229-4, shall be included in the contract price, but not itemized on the monthly invoice." B.1.2.

50.     Volume IV, Table J.9.4, committed the carrier to "comply" with the requirement that it provide a separate itemized list of taxes that would ne included in the monthly invoices, including the name of the tax, jurisdiction by name, and applicable tax rate. L.38.4(a).

51.     Volume IV, Table J.9.4, committed the carrier to "comply" with the requirement that it submit completed price tables containing its entire price structure and detail prices for the 96- month contract period. L.38.4.1.

52.     Volume IV, Table J.9.4, committed the carrier to "comply" with the requirement that it shall supply all terms and conditions that it intends to include in the filings if it is awarded a contract. L.38.4.1.

53.     Volume IV, Section 1.0 "Pricing Overview," Clause L.38.4 committed the

11

carrier to provide a separate itemized list of taxes that would be included in monthly invoices including the name of the tax, jurisdiction by name and applicable tax rate and cross-references Section B.1.2. .

54.    Volume IV, Section 1.0 "General Principles," Clause B.1.2 reiterated the requirement that "[t]he unit prices for services and features (as defined in the Section B pricing tables) shall not include domestic Federal, state or local taxes, non-domestic taxes and duties in effect that the taxing authority is imposing and collecting on the transactions or property covered by this contract. Excepted taxes, as defined in Federal Acquisition Regulation (FAR) 52.229-4, shall be included in the contract price, but not itemized on the monthly invoices."

55.    Volume IV, Section 1.0 "General Principles," Clause B.1.2 further provided that "[t]he unit prices for services and features (as defined in the RFP Section B pricing tables) are exclusive of applicable taxes, (MDE0001) duties, and surcharges as set forth below."

56.    Volume IV, Section 1.0 "General Principles," Clause B.1.2 further set forth what it represented to be a "list of taxes that will be included in monthly invoices" and notes that the rates shown are provided as examples; they are not fixed and may change from time to time." This Table sets forth rates for "new tax surcharge[s]," "interstate gross receipts surcharge rates," and "total interstate surcharge rates" for all fifty states and the District of Columbia.

57.    Volume IV, Section 1.0 "General Principles," Clause B.1.2 further provided that the carrier would not impose a tax surcharge as a result of the state levying a property tax on the carrier's interstate property in Delaware, Hawaii, New Hampshire, North Dakota and Wisconsin.

58.    Volume IV, Section 1.0 "General Principles," Clause B.1.2 further stated that the range for the property tax surcharge is between 0.02% - 2.31% with an average surcharge rate of 0.44%.

12

59.     Volume IV, Section 1.0 "General Principles," Clause B.1.2 set forth an additional chart entitled "State Taxes in Effect for March 1998" and set forth taxes in six categories: "intra usage," "inter usage," "install fees," "access charges," "admin fees," and "equipment rental."

60.     Chart 1.0-2 includes interpretative notes which provide a "key" for the taxes listed on Chart 1.0-2 and stated that the listed taxes include Federal Excise Taxes which would appear on the invoice as "Federal Excise Tax,"sales taxes and utility taxes which will appear on the invoice as "state and local taxes," and Gross Receipts Pass Through Surcharge which will appear on the invoice as "State and Local Surcharge."

61.     The interpretative notes also stated that "an additional state and local surcharge is imposed for interstate and international service charged in states that levy a property tax on MCI's interstate property" and will be disclosed on the customer invoice as "state and local surcharge" and combined with other surcharges presently imposed on the state.

62.     Accordingly, under the Federal Acquisition Regulations and the FTS2001 Contract, MCI was permitted to invoice separately only a limited number of charges in addition to the amount that is the product of the unit price of each service and the number of units of service purchased. Acceptable charges included the Federal Universal Service Fund fee and the PICC charges. Acceptable charges may also have appeared as a separate line on the invoices and included a surcharge equal to amounts paid by the carrier as "gross income taxes levied on or measured by sales or receipts from sales, property taxes assessed on completed supplies covered by the contract, or any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is in the Government."

63.     Other surcharges that recover portions of the carrier's costs of doing business were

13

not permitted to be passed on to the United States through separate charges and were deemed to
be included within the price set by the contract.

### C.  The FTS2001 Bridge Contract

64.     The FTS2001 Bridge Contract is substantially similar to the  FTS2001 Contract

for submission of invoices and charges to those set forth infra at paragraphs 32-63.  Just as under

the FTS2001 Contract, defendant Verizon Communications Inc may not submit to the United

States for payment of certain costs of doing business as these charges are deemed to be within the

price set by the contract.

### V   ALLEGATIONS

65.     Upon investigation, Relator Shea discovered that, during the time it administered

the FTS2001 Contract, MCI made claims for multiple surcharges as line items on its invoices

under the FTS2001 Contract.

66.     The Federal Universal Service Fund surcharge, the PICC surcharge, and certain

other taxes were acceptable line item charges under the FTS2001 Contract.  Specifically,

surcharges equal to amounts paid by MCI as "gross income taxes levied on or measured by sales

or receipts from sales, property taxes assessed on completed supplies covered by the contract, or

any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is

in the Government" were permitted.

67.     No other surcharges were to be included as separate line items on the invoices

under the FTS2001 Contract.  These additional charges were included in the contract price.

68.     Despite the clear prohibition in the FAR and the FTS2001 contract, Relator has

14

reason to believe, and on that basis alleges, that MCI submitted line items charges on its invoices to the United States that represented charges for "excepted taxes" and other ordinary surcharges that reflected MCI's cost of doing business and/or excess profit to MCI, and that were not reimbursable under the FTS2001 Contract.

69.    Relator also has reason to believe, and on that basis alleges, that after the 2006 merger with Verizon Communications Inc., Verizon Business, assuming MCI's responsibilities under the FTS2001 Contract, and later the FTS2001 Bridge Contract, also has submitted, and continues to submit, line items charges on its invoices to the United States that represent charges for "excepted taxes" and other ordinary surcharges that reflect Verizon's cost of doing business and/or excess profit, and that are not reimbursable under the FTS2001 Contract or FTS2001 Bridge Contract. .

70.    On or about August 13, 2004, Relator Shea received an MCI document that purported to show "the taxes and surcharges that the Federal Government is responsible for."

71.    The surcharges prepared by MCI were characterized as "a list of taxes that the Government must pay." These charges included Federal Regulatory Fee surcharges, state sales, excise and utility taxes; and surcharges based on the following state and local fees, contributions and taxes assessed on the carrier: public utility commission fees, state universal service fund and high cost fund contributions; state "deaf taxes;" state and local gross receipts taxes; business license fees; 911 taxes; tele-relay service charges; ad valorem taxes; business, occupational and franchise taxes.

72.    Federal Regulatory Fee surcharges are not permitted under the FAR Regulations, the FTS2001 Contract, or the FTS 2001 Bridge Contract.

73.    Surcharges based on state utility taxes are likely not permitted under the FAR

15

Regulations, the FTS2001 Contract, or the FTS 2001 Bridge Contract.

75.     Surcharges based on the following state and local fees, contributions and taxes
assessed on the carrier: public utility commission fees, state universal service fund and high cost
fund contributions; state "deaf taxes" are not permitted under the FAR Regulations, the FTS2001
Contract, or the FTS2001 Bridge Contract.

76.     Surcharges based on state and local gross receipts taxes are likely not permitted
under the FAR Regulations or the FTS2001 Contract.

77.     Surcharges based on ad valorem taxes are not permitted under the FAR
Regulations, the FTS2001 Contract, or the FTS2001 Bridge Contract.

78.     Surcharges based on business license fees; 911 taxes; tele-relay service charges;
and business, occupational and franchise taxes are not permitted under the FAR Regulations, the
FTS2001 Contract, or the FTS2001 Bridge Contract.

79.     In submitting invoices to the United States with surcharges listed above, MCI
appears to have been invoicing the United States in the same way that it invoiced many of its
commercial clients notwithstanding the terms of the FTS2001 Contract and governing FAR
regulations.

80.     "Enterprise" or corporate clients typically received invoices from MCI that
included a wide array of surcharges with such titles as "state and local taxes," "federal excise
tax," federal, state and local surcharges," "local 9-1-1 fee," "state infrastructure maintenance fee,"
"state high cost fund," "state universal lifeline telephone service surcharge," and "state relay
devices and common service fund." Relator has reason to believe, and on that basis alleges, that
MCI used the same billing platform that it used for enterprise customers to bill the United States
without modifying its systems to reflect the terms of the FTS2001 Contract.

16

81.   Relator has reason to believe, and on that basis alleges, that Verizon Business also uses the same billing platform that it uses for its business customers to bill the United States without modifying its systems to reflect the terms of the FTS2001 Contract or the FTS2001 Bridge Contract.

82.   In addition, Relator has reason to believe, and on that basis alleges, that MCI systematically inflated some or all of the surcharges on its invoices and that those charges bore no reasonable relationship to actual charges incurred by the carrier for the governmental programs to which they appeared to relate. Surcharges set forth on MCI invoices were arbitrary and related to the rate of return on the contract that MCI sought to achieve rather than recovery of the costs associated with actual taxes or fees paid by MCI.

83.   On information and belief, Relator alleges that Verizon Business continues MCI's practice of systematically inflating some or all of the surcharges on its invoices and setting the charges arbitrarily based on the rate of return on the contract that Verizon seeks to achieve rather than recovery of the costs associated with actual taxes or fees that Verizon pays.

84.   An example is the "Federal Regulatory Fee." This Fee violates the express terms of FAR and the FTS2001 Contract and does not appear to fall within the exemptions from "excepted taxes." In addition, Verizon has set the Federal Regulatory Fee at 1.78% of the overall charge for is corporate clients. Relator has reason to believe, and on that basis alleges, that Verizon submits invoices with a line item charge of 1.78% for the Federal Regulatory Fee to the United States. That charge appears to be excessive and to bear no reasonable relationship to any particular Federal charge.

85.   Inflation of line item surcharges occurred, and continues to occur, for property

taxes as well. Certain property taxes are properly invoiced as charges under the FTS2001

Contract and FAR Regulations as long as they represent "property taxes assessed on completed

supplies covered by the contract, or any tax assessed on the Contractor's possession of, interest

in, or use of property, title to which is in the Government." Relator has reason to believe, and on

that basis alleges, that MCI charged the United States approximately twice what it must pay in

local property taxes and that Verizon continues that fraudulent practice.

**Count I**
**False Claims Act 31 U.S.C. §§3729(a)(1) and (a)(2)**

88      Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 85 of this Complaint.

89.     This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. §3729, et seq., as amended.

90.     By virtue of the acts described above, MCI, Inc. knowingly presented or caused to

be presented, false or fraudulent claims to the United States for payment or approval.

91.     By virtue of the acts described above, MCI, Inc. knowingly made, used, or caused

to be made or used false or fraudulent records and statements, and omitted material facts, to

induce the United States to approve and pay such false or fraudulent claims.

92.     In 2006, Verizon Communications merged with MCI, Inc. and assumed its

responsibilities and liabilities under the FTS2001 Contract.

93.     Defendant Verizon Communication Services, Inc. knowingly presents or causes to

be presented, false or fraudulent claims to the United States for payment or approval.

94.     Defendant Verizon Communication Services, Inc. knowingly makes, uses, or

18

causes to be made or used false or fraudulent records and statements, and omits material facts, to induce the United States to approve and pay such false or fraudulent claims

95.     Each claim for reimbursement for Federal, State and local taxes, duties and other surcharges not payable under the FTS2001 Contract or the FTS 2001 Bridge Contract represents a false or fraudulent claim for payment.

96.     Plaintiffs cannot at this time identify all of the false claims for payment that have been caused by defendant's conduct.  Defendant and the United States have within their possession the records that demonstrate the false claims and the amount of money improperly paid to defendant Verizon Communications and its predecessor MCI, Inc..

97.     The United States unaware of the falsity of the records, statements and claims made or caused to be made by defendant paid, and continues to pay, the claims that would not be paid but for defendant's illegal practice

98.     By reason of defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

### Prayer

WHEREFORE, Plaintiffs pray for judgment against the defendant as follows:

1.     that defendant cease and desist from violating 31 U.S.C. §3729 et seq.;

2.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3.     that Plaintiffs be awarded the maximum amount allowed pursuant to §3730(d) of the federal False Claims Act;

4.    that Plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and

5.    that Plaintiffs recover such other relief as the Court deems just and proper.

## **Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Dated: January 16, 2007               By:    *Colette G. Matzzie*
                                              Mary Louise Cohen
                                              DC Bar # 298299
                                              Colette G. Matzzie
                                              DC Bar # 451230
                                              PHILLIPS & COHEN LLP
                                              2000 Massachusetts Ave, N.W.
                                              Washington, D.C.  20036
                                              Telephone:  (202) 833-4567
                                              Fax: (202) 833-1815

                                              Attorneys for Plaintiffs/Relators Stephen Shea and 2Probe LLC