UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| EX REL. STEPHEN M. SHEA and | ) | C.A. No. 1:07CV00111 |
| 2PROBE LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Verizon Communications Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**RELATOR'S MEMORANDUM IN SUPPORT
OF MOTION FOR RELATOR SHARE AWARD**

**Introduction and Summary of Argument**

In January 2007, Relator Stephen M. Shea filed the Complaint in this False Claims Act action alleging that MCI/Verizon was submitting false claims for illegal surcharges on invoices submitted under the United States' principal telecommunications contract (FTS2001 and FTS2001 Bridge Contract). Relator Shea has nearly two decades of professional experience in negotiating large telecommunication contracts for enterprise customers and recouping overcharges in the tens of millions for his clients.

In February 2011, the United States intervened and settled the action for $93.5 million (including accrued interest) resolving the fraud allegations brought in Relator's January 2007 Complaint. In April 2008, the Government recovered an additional $3 million for surcharges pled in Relator's Complaint (State Universal Fund Surcharges). The Government's investigation of the surcharges tracked closely the investigative path identified by Relator in the 2007 Complaint. With the exception of one "GMS Fee" worth a little over a million, the surcharges released in the 2011 Settlement Agreement had been specified in Relator's 2007 Complaint. Moreover, Relator

1

Shea added over $5 million to the total damage recovery by identifying an additional overcharge (FUSF on top of Nonallowable Charges) not caught by the GSA audit team even after its review of billing data

The False Claims Act provides that, in a successful case where the government intervenes, the Relator shall be entitled to 15% to 25% of the government's recovery depending on the extent to which the person "substantially contributed" to the prosecution of the action.  31 U.S.C. ¶ 3730(d)(1).  Through this motion, Relator Stephen Shea seeks an award of a Relator share of 22% the proceeds of this action.  There are three issues to be decided in this motion: (1) what percentage of the total proceeds should  be awarded to Relator Shea for his contributions to securing the recovery for the United States, (2) should Relator Shea receive a share of the $1,322,248 for the "GMS Fee" recovered by the United States in this action and released as part of the settlement; (3) should Relator Shea receive an award for the additional $3 million recovered by the General Services Administration (GSA) in 2008 for State Universal Service Fund charges.  Submission of the State Universal Service Fund surcharges was alleged in the 2007 Shea complaint and was released in the 2011 settlement.[1]

Here, numerous factors militate in favor of a factual finding that Mr. Shea "substantially contributed" to the Government's recovery and should receive an award well above the midpoint of the statutory range.

First, Mr. Shea provided the Government with the critical "insider" MCI document that cracked open the fraud and showed the illegal surcharges submitted to the United States.  Mr. Shea obtained this document as part of his independent, pre-filing investigation and submitted it

---

[1] The United States paid Relator an initial 15% of the proceeds excluding from the award the amount collected for the GMS fee.

with his disclosure of material evidence in early 2007. Second, from the inception of the case, Mr. Shea described in detail and with specificity the specific prohibited surcharges submitted by Verizon. Mr. Shea focused the Government's investigation on the "ad valorem/property surcharge" and the "Federal Regulatory Fees/ Common Carrier" surcharges which eventually constituted over 80% of the damages recovered in the 2011 settlement. In addition, Mr. Shea identified for the Government an additional overcharge which would have been overlooked by the GSA auditors during the course of the investigation -- FUSF Applied to Unallowable Surcharges (an additional $5.083,438 (including a multiplier)). Initial damages estimates from the Government did not recoup this amount.

Moreover, although GSA has a dedicated team of auditors tasked with review of invoices under the FTS2001 contract, the agency had apparently never identified the illegal surcharges identified by Relator in almost a decade of contract administration. Only with Mr. Shea's considerable expertise in the telecommunications industry and pre-filing investigation, was he able to identify the overcharges and determine that these were illegitimate charges imposed on the Government. The Government's apparent ignorance of the fraud perpetrated against it argues in favor of a substantial share.

So too, Mr. Shea, and his counsel, substantially contributed to the successful resolution of the action by analysis of hundreds of individual surcharges through state and municipal codes, legal analysis of the relevant Federal Acquisition Regulations and the history of negotiations under the FTS 2001 Contract, and refutation of arguments made by Verizon. Mr. Shea spent hundreds of hours on the case each year and counsel spent over 1200 hours of attorney and paralegal time. This time was spent at great personal and professional sacrifice by Mr. Shea. Mr.

Shea gave up a lucrative business arrangement in private consulting to be in a position to focus on this case and to hire experienced qui tam counsel.

In the end, the efforts of Relator, counsel, and the Government team, resulted in a successful settlement of $96.5 million (including the plus $3 million collected for State Universal Fund Surcharges three years earlier).  The financial impact of the settlement is even greater given that Verizon ceased submission of the surcharges in 2010.  In addition, GSA gained valuable information about the practices of Verizon in billing enterprise customers useful for negotiation of the successor contract, Networx.  Networx expressly excludes many of the illegal surcharges at a savings of up to $100 million going forward.  Given the significant efforts made by Shea and his lawyers, application of the "substantial contribution" standard justifies a Relator share award of 22% of the total proceeds from the action.

## OVERVIEW OF THE GOVERNING LAW

The False Claims Act, as amended in 1986, sets a range of awards for Relator share between 15% and 25% to advance two goals.  First, the 15% minimum was devised "in the nature of a 'finder's fee' [in order] to develop incentives for people to bring information forwards."  132 Cong. Rec. H 9389 (daily ed. Oct. 7, 1986) (statement of Rep. Berman).  That amount is therefore paid "even if that person does nothing more than file the action in federal court."  *Id. See, e.g., United States v. Stern*, 818 F. Supp. 1521, 1522 (M.D. Fla. 1993) (Relator who did nothing to assist with prosecution of case received a 15% share).

Where a Relator's contributions go far beyond the mere filing of a complaint, however, an award well in excess of the statutory minimum is obligatory.  By offering relators the promise of an increased stake in the outcome of their cases based upon the extent to which they substantially contributed to the prosecution of the action, Congress created an incentive for relators and their

4

counsel to commit time, money and resources needed to litigate aggressively on behalf of the taxpayers.  S*ee also* S. Rep. No. 99-345, at 28 (1986) (noting that the Government still receives most of the recovery and significantly more than 'the zero percent it would have received had the person not brought the evidence of fraud to its attention or advanced the case in litigation.'"), reprinted in 1986 USCCAN 5266, 5293.

The only factor that the False Claims Act identifies as relevant to the amount greater than 15% to be awarded is the "substantial contribution" of the Relator.  The Senate bill originally identified three factors to be taken into account: (1) the significance of the information provided, (2) the contribution of the person bringing the action to the results obtained, and (3) whether the information which formed the basis for the suit was known to the Government.  *See* S. Rep. No. 99-345, at 28 (1986), reprinted in 1986 USCCAN 5266, 5293 (and in Appendix B-2).  The first Senate factor, a contribution of significant information, includes the development of factual information, documentary evidence, and legal arguments.  *United States ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1332 (M.D. Fla. 2001); s*ee also United States ex rel. Johnson-Pochardt v. Rapid City Regional Hospital*, 252 F. Supp. 2d 892,897,904 (D. S.D. 2003) (noting that a Relator should receive a 15% share just for filing the case and awarding 24% on account of the substantial contribution by the Relator and her counsel); *United States ex rel. The Virgin Islands Housing Authority v. Coastal General Construction*, 299 F. Supp. 2d 483, 489 (D. VI 2004) (25% awarded where Relator was original source of information to the United States and spent a great deal of time and resources investigating the fraud).

The legislative history of the House version of the 1986 amendments, ultimately adopted as section 3730(d)(1), also described what might be considered for a relator share award:  "In those cases where the person carefully develops all the facts and supporting documentation

necessary to make the case required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above 15% and up to 25%." 132 Cong. Rec. H9382-83) (Oct. 7, 1986) (statement of Rep. Howard Berman) ("House factors"). Courts have cited both the so-called House and Senate factors to determine relator share. *See, e.g., Quorum,*, 171 F. Supp. 2d at 1332.

In addition, in the 1990s, the Department of Justice adopted a set of internal "Relator's Share Guidelines" to assist DOJ attorneys in negotiating relator share or proposing an amount to a court. *Id.* at 1333 (internal citation omitted).   The DOJ Guidelines are not federal regulations and courts have commented that they are of limited and mixed utility. *Id.* at 1333-34; *see also Johnson-Pochardt*, 252 F. Supp. 2d at 900.[2]

---

[2] The DOJ factors for consideration for a possible increase in the percentage: (1) The Relator reported the fraud promptly; (2) when he learned of the fraud, the Relator tried to stop the fraud or reported it to a supervisor or the Government; (3) the qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) the complaint warned the Government of a significant safety issue; (5) the complaint exposed a nationwide practice; (6) the Relator provided extensive, first-hand details of the fraud to the Government; (7) the Government had no knowledge of the fraud; (8) the Relator provided substantial assistance during the investigation and/or pre-trial phases of the case; (9) at his deposition and/or trial, the Relator was an excellent, credible witness; (10) the Relator's counsel provided substantial assistance to the Government; (11) the Relator and his counsel supported and cooperated with the Government during the entire proceeding; (12) the case went to trial; (13) the FCA recovery was relatively small; (14) the filing of the complaint had a substantial adverse impact on the Relator.  The factors to consider for a possible decrease in the share are (1) the Relator participated in the fraud; (2) the Relator substantially delayed in reporting the fraud or filing the complaint; (3) he Relator, or Relator's counsel, violated FCA procedures; (4) the Relator had little knowledge of the fraud or only suspicions; (5) the Relator's knowledge was based primarily on public information; (6) the Relator learned of the fraud in the course of his Government employment; (7) the Government already knew of the fraud; (8) the Relator, or Relator's counsel, did not provide any help after filing the complaint,  (9) the Relator hampered the Government's efforts in developing the case, or unreasonably opposed the Government's position in litigation; (10) the case required a substantial effort by the Government to develop the facts to win the lawsuit; (11) the case settled

In the end, Congress recognized that the contribution of some relators would be greater than others and left discretion to the Court to determine the amount of the Relator's award based upon the Relator's contributions. *Quorum.*, 171 F. Supp. 2d at 1332; *United States ex rel. Merena v. SmithKline Beecham Corp.*, 52 F. Supp. 2d 420, 499 (E.D. Pa. 1998) (determination of relator share is "largely a judgment call"). One method for evaluating an award commensurate with the Relator's contribution to the recovery is to start at the 20% midpoint and consider the factors – whether elucidated by the Congress or DOJ – to determine how much to increase or decrease from the midpoint. As discussed herein, the factors, considered here, militate in favor of a 22% relator share award.

## ARGUMENT

### I.    Relator Substantially Contributed to Recovery

#### A.    Relator Shea Provided Significant Information and Evidence To the Government

Mr. Shea discovered the false and fraudulent claims that are at issue in this case through an investigation he undertook of MCI's billing practices including interviewing witnesses and reviewing invoices to ensure that MCI was correctly implementing negotiated contracts. Relator Stephen Shea is the former managing director of TechCaliber LLC (the leading consulting firm helping clients manage their investments in telecommunication services and network infrastructure) where his client list included many Fortune 100 companies. Before even filing this action, he had been responsible for collecting in excess of $50 million in overcharges from the telecommunication carriers for his clients. During the course of this work for private clients, he

---

shortly after the complaint was filed or with little need for discovery; (12) the FCA recovery was relatively large.

focused on a few key concerns.  Declaration of Stephen M. Shea ¶¶ 4-8.

First, Mr. Shea noticed that the surcharge for property taxes that had first been imposed on private enterprise customers in 1996 was being used as a hidden source of revenue for MCI.  This surcharge was increasingly dramatically each year with no logical relationship to any increase in MCI's actual property taxes.  Second, he learned from two MCI insiders in a position to know about tax and surcharge issues, that MCI was not customer specific in imposing surcharges and that it had built its billing platforms in ways that made it difficult to turn taxes and surcharges "on" and "off" for certain customers.  Third, he noticed that MCI was providing Responses to Requests for Proposals from private clients that included surcharges that would never be permitted under governmental contracts (such as the Federal Regulatory Fee which was later renamed by the carrier as the Common Carrier Recovery Charge).  *Id.* ¶ 8.

Around the same time, Mr. Shea undertook a careful analysis of the FTS2001 contract to determine what categories of surcharges could not, as a matter of contract and law, be imposed on the United States.  Mr. Shea concluded that certain key surcharges, including charges for property taxes and franchise taxes, could not be imposed on the government and that the government contracts and governing regulations strictly limited which surcharges could be imposed.  Through this work, Mr. Shea came to understand that the Federal Acquisition Regulations (FARs) set forth requirements for firm, fixed-price contracts.  Firm fixed-price contracts provide for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract.   48 C.F.R. §§ 16-202-1-16.203-4.   He researched the government's contracts for telecommunication services and learned that they are firm, fixed-price contracts including the FTS2001 Contract and the FTS2001 Bridge Contract.  Shea Decl. ¶¶ 9-10.

Mr. Shea also learned that provisions of the FARs also deal with the management of

Federal, State and local taxes or duties under the pricing structure of a firm, fixed-price contract. 48 C.F.R. §§ 29.401-3; 52.229-3-52.229-4.   Unless expressly excluded in the contract, "the contract price includes all applicable Federal, States and local taxes and duties."  48 C.F.R. § 52.229-4(b).  He also came to realize from his extensive work with MCI and his clients, that the surcharges being imposed by MCI on its customers, including the United States, are not the kind of "taxes or duties on the transactions or property" addressed by the FARs.  The FARs are clear that references to "applicable Federal, State and local taxes and duties" are "taxes and duties, in effect on the contract date, that the taxing authority is imposing and collecting on the transactions or property covered by this contract."  48 C.F.R. §§ 52.229-3-52.229-4.  Shea Decl. ¶¶ 11-12.

What Mr. Shea eventually discovered was that MCI (and later Verizon) was billing the government for surcharges as though they were surcharges imposed on the transaction when, in fact, they were seeking to collect back their own costs of doing business.  Mr. Shea began to investigate whether MCI was attempting to pass on the same illegal surcharges, designated as "federal, state and local taxes," "fees," "surcharges," or "tax-like surcharges" and other similar names, to the United States under the FTS2001 Contract.  *Id.* ¶¶ 13-16.

What Mr. Shea discovered – and used as the primary basis of the allegations in his Complaint -- was an "insider" MCI document.  Shea Decl. ¶¶ 17-20; Declaration of Colette G. Matzzie ¶¶ 2,6, Exhibit B.  Mr. Shea received the document from a MCI contact.  The MCI document purported to show "the taxes and surcharges that the Federal Government is responsible for."  Through review of this "insider" document, Mr. Shea came to understand that MCI was imposing far more surcharges than it was permitted to do so under the FTS Contract or the FARs.  These charges included Federal Regulatory Fee surcharges, state sales, excise and utility taxes; and surcharges based on the following state and local fees, contributions and taxes

9

assessed on the carrier: public utility commission fees, state universal service fund and high cost

fund contributions; state "deaf taxes;" state and local gross receipts taxes; business license fees;

911 taxes; tele-relay service charges; ad valorem taxes; business, occupational and franchise

taxes. *Id*.

      Mr. Shea's complaint, filed in 2007, alleges that the prohibited charges listed on the

"insider" MCI document were being submitted to the United States, first by MCI and then later

by Verizon. *See* Dkt. 1; *see also* Shea Decl. ¶¶ 21-22. These allegations became the template for

the overcharges recovered by the Government in this action. With the exception of one charge,

the charges listed in the Covered Conduct release in the February 2011 Settlement Agreement are

the very surcharges identified by Mr. Shea in his 2007 Complaint. *See* Declaration of Colette G.

Matzzie, Exhibit E. Moreover, over 80% of the recovery by the Government was from the two

surcharges Mr. Shea urged the Government to prioritize and focus on in its investigation starting

in 2007: ad valorem/property taxes and Federal Regulatory Fees/Common Carrier Recovery

Charges. Shea Decl. ¶ 22. Based on his many years of experience, Mr. Shea knew that these

charges were likely to be a materially large source of revenue for Verizon (and damages for the

United States) and also that the listed charges were clearly impermissible under the FTS 2001

Contract and the FARs. *Id.*; *See Quorum*, 171 F. Supp. 2d at 1332 (knowledge of hospital

accounting practices and initial allegations and information formed the basis for a successful qui

tam action).

      Accordingly, Mr. Shea's "contribution" to the Government's recovery began with

extensive pre-filing research and by obtaining and providing the Government with the critical

document and information demonstrating that MCI was submitting illegal overcharges to the

United States. Matzzie Decl. ¶¶ 2,6, Exhibit B. He provided this document to the United States

at the time of filing the Complaint in January 2007 as part of his disclosure of material evidence. *See Johnson-Pochardt*, 252 F. Supp. 2d at 897 (896-97) (Relator provided critical documentary evidence); *United States v. General Electric*, 808 F. Supp. 580, 583 (S.D. Ohio 1992) (Relator provided important documents).  In addition, Mr. Shea hired Phillips & Cohen LLP, a nationally-recognized qui tam law firm with a track record of recovering billions for the United States, to launch his effort to recoup money for the United States from Verizon.  Shea Decl. ¶ 23; s*ee Johnson-Pochardt*, 252 F. Supp. 2d at 897; *Quorum*, 171 F. Supp. 2d at 1326-27.[3]

### B.       The Government Lacked Prior Knowledge of the Illegal Surcharges

Here, the Government was not aware of the overcharges before Relator identified the overcharges, Shea Decl. ¶¶ 24-25, significant factor counseling in favor of a robust relator share in this case.  *See* S. Rep. No. 99-345, at 29 (9186); *see also Johnson-Pochardt*, 252 F. Supp. 2d at 899 (government had no prior knowledge); *United States ex rel. Fox v. Northwest Nephrology Associates*, 87 F. Supp. 2d 1103, 1112 (2000) (government previously did not know of fraud); *Quorum*, 171 F. Supp. 2d at 1333 (same).

Early in the investigation, at one of the first meetings with the Government in Washington, DC, Relator learned that although the General Services Administration (GSA) had a team of auditors who routinely review the invoices under the FTS2001 contract, that GSA had not

---

[3] In approximately February 2009, Mr. Shea retained additional counsel with a specialty in telecommunications law to assist my qui tam counsel.  His additional counsel is Doug Jarrett of the law firm of Keller Heckman LLP.  Douglas Jarrett is a leading telecommunications attorney, representing critical infrastructure industry ("CII") companies, entrepreneurs, domestic and foreign corporations and state and local governments before the Federal Communications Commission (FCC) on Wireless, Telecommunications and Media policy, licensing and enforcement matters. He is a recognized expert in representing enterprises in negotiating telecommunications and networking services agreements with the major wireline and wireless carriers and in disputes arising under these agreements.  Shea Decl. ¶ 30; Matzzie Decl. ¶ 5.

previously identified the overcharges alleged by Relator and had not even audited that section of the invoice or contract.  Shea Decl. ¶¶ 24-25.  Although these charges are a small percentage of the United States' total bill for telecommunication services, these overcharges still represent significant revenue for the carrier and damages to the United States.  In other words, Mr. Shea's Complaint identified a significant area of government fraud of which the United States had been unaware and, without Mr. Shea's efforts to bring this qui tam suit, Verizon would have continued to overcharge the United States indefinitely.  *Id.*

Careful research had to be performed to demonstrate that the FTS2001 contract and the FAR provisions did not allow for each of the identified surcharges to be imposed.  Reference also had to be made to the history of negotiations between MCI/Verizon and the GSA to show that the carrier had good reason to know that such surcharges were impermissible.  Relator's contribution to the recovery in this case commenced with responding to a request from the Government, in July 2007, to set forth in a memorandum Relator's position on why each surcharge was prohibited under the FAR and the contract and that the surcharges be ranked in priority for investigation.  To respond to this request from DOJ lawyers, Mr. Shea and his counsel prepares an extensive chart listing each surcharge that he understood to be illegal and providing the United States with a cross-reference to why it was illegal (under the contract, under the FAR, inflated value, etc.).  Shea Decl. ¶¶ 26-27; Matzzie Decl. ¶ 7, Exhibit C.

On July 26, 2007, Relator and counsel presented the Government with the requested chart and a legal memorandum walking through the factual and legal basis for the allegations for each surcharge.  The letter also emphasized that the two charges the Government should scrutinize initially and prioritize for investigation were ad valorem/property and Federal Regulatory Fee (what later came to be called Common Carrier Recovery Charge or CCRC).  It was these two

charges that eventually constituted over 80% of the Government's damages in the 2011

Settlement.  Getting the Government to focus on the ad valorem and Federal Regulatory Fee first

was useful because, when the government auditors were able to see relatively quickly the ad

valorem charges in Verizon's back up billing data, it provided a basis for the Government to press

on with the investigation and, eventually in early 2009, to issue subpoenas focused on evidence of

scienter within the company.  Shea Decl. ¶¶ 26-27; Matzzie Decl. ¶ 7, Exhibit C; *see also*

*Johnson-Pochardt*, 252 F. Supp. 2d at 897.

      **C.**      **Relator and His Counsel Contributed Substantially to the Recovery**

      Relator Shea and his attorneys made significant contributions to the recovery of $93.5

million in this case (plus the $3 million in SUSF).  Information from Relator essentially

established the claims brought against MCI/Verizon.  Moreover, for almost four years, Relator

and his counsel played an active and constructive role along with the United States in building a

case against MCI/Verizon.  Relator's efforts resulted in the United States' decision to intervene

and seek settlement and also in Verizon's decision to settle the case for a substantial sum.  *See*

*Johnson-Pochardt,* 252 F. Supp. 2d at 897 (discussing assistance provided by the Relator and

counsel over two year period); *Quorum*, 171 F. Supp. at 1322-30 (discussing contributions during

investigation and assistance of counsel and experts).

      Once the government's investigation began in earnest, and the government had requested

the supporting documentation underlying the surcharges on the FTS2001 invoices, Relator and

counsel continue to provide substantial assistance to the government and met, in person or by

phone with counsel for the government and auditors and counsel from GSA.  Relator regularly

provided additional documentary evidence to the government including information uniquely

available to him in his capacity as a consulting expert through my participation in telecommunication tax conferences.  Shea Decl. ¶ 28.

In late 2008, Relator collaborated with the government, through counsel, to draft proposed subpoena categories.  He identified former MCI witnesses and provided information about the administration of government contracts within the carrier.  He explained to the government the basis of the allegation that MCI used a uniform billing platform for all enterprise customers as well as government contracts.  He described to the government the job descriptions for persons likely to have "talking documents" describing MCI/Verizon's understanding of the terms of the FTS2001 contract and implementation of the requirements of the FTS2001 contract within the carrier.  Id. ¶ 29.

Relator spent hundreds of hours on this case, traveling to Washington DC at least ten times since filing for meetings with counsel, government lawyers and investigators, and status conferences.  On numerous occasions, Relator asked to discuss with government auditors the methods they were using to identify illegal surcharges and had several conference calls in 2009 with the team of auditors in Kansas on these issues.  He personally attended and participated in every status conference scheduled by this Court using the status conferences as an opportunity to press the government for an in depth and exhaustive investigation as well as a timely one.  He requested that the Government keep him up to date on the findings of the GSA audit team including the types of overcharges GSA identified and amounts, and any questions that arose about whether the claims were knowingly false.  In order to facilitate that collaboration, Relator and counsel signed a Non Disclosure and Confidentiality Agreement as requested by the United States.  Id. ¶¶ 31-32.

In late 2009, when Verizon and the United States commenced serious discussions around liability, and eventually damages, Mr. Shea and his counsel undertook to review a November 2009 PowerPoint presentation Verizon had used to present its defenses to the United States.  The Government welcomed Relator's response to Verizon's presentation.  Relator and counsel worked intensively over several weeks to present to the Government an affirmative case and to refute Verizon's defenses.  In a multi-hour presentation to DOJ on December 7, 2009, Relator and counsel identified for the government significant mischaracterizations of the negotiating history for the FTS2001 Contract made by Verizon, including mischaracterizations of the agreements over MCI's Price proposals in its 1999 Response to the Request for Proposals on the FTS2001 Contract.

At this point, it became clear that the battleground with Verizon would not be whether or not it had submitted the overcharges alleged, but whether it had reason to know that the charges were improper.  Key to this analysis was obtaining for review and analysis the documents exchanged between MCI and GSA in 1999. Relator and counsel were also able to explain to the government in detail why certain surcharges should be included in the government's damages analysis.  Shea Decl. ¶¶ 33-34; Matzzie Decl. ¶ 8, Exhibit D.

A major breakthrough occurred through Relator's analysis of the Verizon defenses and discussions with the United States in December 2009 – February 2010.  Relator was able to demonstrate to the satisfaction of the Government that, in addition to the illegal property tax surcharge and other franchise surcharges that are expressly impermissible under the FTS2001 Contract and related FARs, there was absolutely no justification for MCI/Verizon charging the Government for the Federal Regulatory Fee/Common Carrier Recovery Charge and that the charges in this category had been escalating at increasingly higher percentages.  The Federal

Regulatory Fee/CCRC is a completely invented surcharge to boost carrier revenue and ended up being a substantial portion of what the United States recovered in its final damages calculation. Without question, the efforts of Mr. Shea and his counsel substantially contributed to recovery of this invented surcharge.  Shea Decl. ¶ 35.

Within a few days after the extensive liability presentation, Relator also assembled for the government a best estimate of damages for the illegal surcharges.  Because the government would not share with Relator the underlying data GSA had obtained from Verizon concerning the overcharges, Relator used multiple public and private sources to estimate the damages attributable through illegal submission of overcharges for property tax and franchise surcharges as well as Federal Regulatory Fee/CCRC.  At that time, Relator estimated for the Government that ad valorem/ property taxes alone would be approximately $81 million in damages over ten years. Relator's counsel also provided the government at that time with written opinions obtained from bankruptcy counsel at separate expense evaluating the likely effect of the bankruptcy court orders in 2004 governing the dissolution of MCI and successor liability of Verizon.  Shea Decl, ¶ 36; Matzzie Decl. ¶ 3.

Shortly after that the government shared with Relator its estimate of damages broken down by surcharge category.  Relator was immediately able to identify for the government an additional category of damages that it had not yet identified which was the amount of the FUSF (Federal Universal Service Fund) that was applied on top of the illegal surcharges.  The government acknowledged that this was a charge that it had not originally included in the damages estimate. This charge alone ended up accounting for over $5 million in the settlement once the Government's multiplier was applied to the damages calculation. Shea Decl. ¶ 37.

In March 2010 and thereafter, as the government was working toward securing agreement from Verizon to a FCA settlement with a multiplier recovery, Relator provided the government with the names of five potential witnesses who had been at MCI during the relevant time period and who could provide reliable information. Relator also identified through the help of a private investigator some additional executive-level managers likely to have relevant knowledge who were former MCI employees living in the DC area. *Id.* ¶ 38.

Starting in March 2010, since Relator knew that the government had focused primarily on ad valorem/property surcharges and the Federal Regulatory Fee/CCRC, Relator also attempted to get the government to focus on recouping many of the franchise fees that were being illegally imposed by Verizon. The government welcomed Relator's offer to analyze the many dozens of franchise fees billed by Verizon and provided him with a sample Contract Data Requirements List (CDRL) listing over 450 surcharges from over 54 jurisdiction including dozens of municipalities. For the next several months, Relator spent many hours, along with his counsel reviewing the franchise taxes and providing the government with an in depth analysis of which charges could not be imposed under the terms of the FTS2001 contract. *Id.* ¶¶ 39-40.

Analyzing the surcharges listed on the CDRL, required a very exhaustive review of literally dozens of state and local ordinances governing the franchise surcharges so as to classify the surcharges. Relator and his team worked on this project for several months and invested many hours and consulted with a former Tax Director for AT&T in late April 2010. This analysis involved separating franchise taxes that were based on gross receipts as defined in Section J.1, J.9.4 of the FTS Contract from all other franchise fees. This analysis also involved identifying surcharges that did not tie to any jurisdiction and could not be submitted to the United States for that reason, charges that were double imposed, and taxes not listed in the table in B.1.2, Volume

17

IV of the FTS2001 contract.  The Department of Justice acknowledged that Relator was performing this work and that the methodology was reasonable.  On June 3, 2010, Relator sent the Government a lengthy analysis setting forth dozens of additional improper tax surcharges.  Shea Decl. ¶ 40; Matzzie Decl. ¶ 7, Exhibit C.

In 2010 while DOJ engaged in settlement negotiations with Verizon, Relator continued to contribute toward the recovery.  That work was intended to support the government in its damages, contract, and bankruptcy theories and to prevent the government from having to concede any issues.  Because Relator has very substantial expertise with identifying damages for clients from carrier overcharges by closely reviewing data provided by the carrier, Relator asked the government repeatedly for the opportunity to review the data.  In September 2010, this Court entered an order on Relator's motion, directing GSA and DOJ to share the data underlying the damages estimate with me.   Although the government continued to refuse to provide the underlying data on the grounds that to do so was impractical, this Court's order caused the government to provide Relator with a detailed breakdown of the government's single damages analysis on which it had imposed a modest multiplier.  In fact, this Court's order resulted in a series of letters in the Fall of 2010 concerning damages.  Relator reviewed the damages analyses and provided feedback to the government of what additional impermissible charges were not covered by the damages analysis.  Although the government did not ultimately adopt some of Relator's ideas for additional damages, his careful review played a critical role in ensuring that no lesser amount was collected.  Shea Decl. ¶¶ 41-42.

Eventually, although Relator believed there to be additional damages available for recoupment, the government settled on a damages figure.  It became clear that, for Verizon to proceed with a settlement acceptable to DOJ, any remaining claims in the action would need to be

dismissed with prejudice.  To assist the United States in securing recoupment of the $92.7 million

plus interest, Relator allowed the United States to settle the case with Verizon for that amount

even though Relator thought it likely that additional claims could be made under the FTS2001

contract.  However, because the United States did collect the largest overcharges and because

Verizon had agreed to stop billing the surcharges, Relator concluded that the settlement was

reasonable under the circumstances and put aside his own opportunity for potential additional

personal gain in favor of facilitating an easy settlement and resolution of the matter between

Verizon and DOJ.   Shea Decl. ¶ 43.

      Relator's contribution, and the contribution of counsel, to the success of this case has been

very substantial.  Without Relator bringing the case, and providing the government with the

critical MCI "insider" document showing the illegal surcharges, none of the $96.5 million would

have been recouped and Verizon would still be submitting invoices to the government for these

illegal surcharges.  The financial value to the government of the case is much greater than $96.5

million as it includes the cessation of future overcharges as well as the deterrent effect on other

overcharges going forward on this and other Verizon contracts.  Shea Decl. ¶ 44.

      Without Relator's participation, the Government might not have investigated as efficiently

or known to look first at ad valorem/property surcharges which Relator knew because of his many

years of experience in the industry.  The government might not have understood that the Federal

Regulatory Fee/CCRC was a wholly trumped up charge and clearly not permitted under the

contract or regulations.  And, as counsel for the government admitted, even though GSA had had

an audit team on this contract for many years, it had not identified the illegal property tax and

miscellaneous franchise surcharges recouped in the settlement of this action.  Relator's

contribution compares favorably to other Relators who have recovered substantial shares awards

through court order.  *See, e.g., Johnson-Pochardt*, 252 F. Supp. at 897 (24% share); *Quorum*, 171 F. Supp. 2d at 1340 (24% share); *Virgin Islands Housing Authority*, 299 F. Supp. 2d 483 (25% share); *United States ex rel. Taxpayers Against Fraud v. General Electric*, 41 F.3d at 1032, 1040 (22.4% share).

### D.      Relator's Contribution Involved Sacrifice and Investment of Time and Effort

Courts have considered the personal toll and professional sacrifice involved in bringing a qui tam action.  *See, e.g., Quorum*, 171 F. Supp. 2d at 1337 (court considered financial hardship and confidentiality burden when increasing relator's award); *United States ex rel. Burr v. Blue Cross and Blue Shield of Florida, Inc.*, 882 F. Supp. 166, 168 (M.D. Fla. 1995) (considering professional or personal impacts of qui tam case).  Here, for Relator Shea, hiring experienced qui tam counsel and bringing this case required him to terminate my involvement with my former business venture, TechCaliber, where he had previously been earning between $1 and $2 million per year as a consultant.  He had to pay substantial sums to the attorneys who had served as investors in TechCaliber to bring the action on his own.  He paid in excess of $500,000 to terminate that partnership and also gave up a lucrative career as the managing partner of TechCaliber.  Shea Decl. ¶ 45.

Moreover, Mr. Shea invested many hundreds of hours in this case including the pre-filing investigation, analysis, post-filing investigation and assistance to the Government, and participation in Court-scheduled status conferences.  He traveled numerous times to Washington DC to participate in meetings or court appearances.  He hired both qui tam counsel and telecommunications counsel, attended telecommunications tax conferences and seminars, and worked with private investigators to locate additional witnesses to provide the Government.  Shea Decl. ¶ 46.

So too, his counsel spent over 1200 hours of attorney and paralegal time on this case. Counsel's work included legal research concerning interpretation of the FTS2001 Contract and negotiating history of contract plus research on the Federal Acquisition Regulations; review of documents provided by Relator, drafting, filing and service of complaint and statutory disclosure statement; interviews of Relator and additional meetings and phone calls from 2007-2010 with Government lawyers, investigators and auditors including professional staff from the United States Attorney's Office, the Department of Justice and the General Services Administration (GSA); preparation of work product and memorandum for the Government including factual and legal issues concerning specific surcharges including ad valorem/property taxes, franchise fees, gross receipts charges, Federal Regulatory Fee and Common Carrier Recovery Charge including extensive research into state and municipal codes and preparation of an extensive presentation on same and refuting defendant's arguments concerning FTS2001 contract and negotiating history; and miscellaneous research shared with Government concerning scienter and contract interpretation issues and bankruptcy.  Relator and counsel also prepared for and participated in all status conferences.  Matzzie Decl. ¶¶ 3-4; s*ee Quorum*, 171 F. Supp. 2d at 1331 n.31 (Relator needs "determined assistance of skilled professionals" to make a substantial contribution).

The remuneration Mr. Shea will receive through this settlement would not exceed what he could have earned if he had focused only on corporate clients rather than pursuing the public interest in FCA enforcement against Verizon/MCI.  The standard fee for recoupment of these charges in private industry would be one-third of the total recovery.  Shea Decl. ¶ 45.  Moreover, Relator's share is intended, in part, to compensate for the emotional strain of confidential litigation and the financial burdens in pursuing the qui tam case as well as to encourage other potential whistleblowers to expose fraud against the United States.  *Quorum*, 171 F. Supp. 2d at

1337; *United States ex rel. Pedicone v. Mazak Corp.*, 807 F. Supp. 1350, 1353 (S.D. Ohio 1992) ("encourage other potential whistleblowers to take risks").  Mr. Shea is one of those Relators "whose conduct in disclosing the fraud is virtually flawless," *General Electric*, 808 F. Supp. at 584, and who deserve a percentage well above mid-range as a result.

      **E.**      **The Financial Value of the 2011 Settlement Exceeds $100 Million**

As a result of Mr. Shea efforts, and the substantial efforts of the GSA audit team and the Department of Justice, a significant recovery of $96.5 million, including $3 million recouped for SUSF charges, was achieved after four years of hard work.  The benefit to the United States from the successful qui tam extends beyond this repayment of almost $100 million.  Verizon was forced to stop the practice of routinely overcharging at least for these particular surcharges going forward on FTS2001 contract and put on notice of the risks of doing so on its other contracts.  In addition, GSA presumably has gained increased knowledge about the carriers' practices of imposing surcharges through this litigation and will be in a better position to enforce its contract, including the new Networx contract, going forward.  Shea Decl. ¶ 44.  Moreover, the qui tam settlement will likely also have a deterrent effect on other carriers who engage in similar practices and may face similar liability.  All of these factors are relevant in considering the share to be awarded and the total value of the settlement to the United States.

Throughout this litigation, Relator acted affirmatively to ensure that the government recouped as much of the damages imposed by Verizon as possible, exactly the role contemplated by Congress in setting a range for Relator share between 15% and 25%.  He took that role extremely seriously.  He hired able counsel and undertook to bring his substantial professional expertise with the carriers and telecommunication surcharges to bear in educating the government and facilitating its recovery.  Relator took very seriously his duty to scrutinize the settlement

agreement closely to determine whether fair, adequate and reasonable and to provide the Court

with his views on the settlement.  Relator also sought to be of assistance to the Court in advancing

the case more expeditiously.  Shea Decl. ¶ 46; Matzzie Decl. ¶ 4.  A relator share award of 22%

share is well earned in this case.[4]

## II.    Relator Shea Should Share In All Proceeds Recovered by the Government

Finally, efforts by the Government to exclude certain proceeds from recovery of a relator

share is wholly lacking in foundation either in law or in the factual record.

The 2011 Settlement Agreement includes a payment of $1,322,248 for a GMS Fee.  See

Matzzie Decl. Exhibit E.  Clearly, that $1.3 million payment is part of the "proceeds of the

action" within the meaning of 31 U.S.C. 3730(d)(1).  The payment was made in partial recovery

of damages alleged to have been part of the false claims submitted in Relator's 2007 Complaint.

Dkt 1.  Although the GMS fee is not explicitly listed in the Complaint, the Complaint makes clear

reference that there are other surcharges under other names that are illegally being submitted by

Verizon.  Matzzie Decl. ¶¶ 10-11; Dkt 1. ¶¶ 68-69.  The insider MCI document submitted by

Relator to the Government to illustrate the kinds of surcharges that would be impermissible

contains dozens of additional surcharges and surcharges by other names.  Matzzie Decl. ¶ 6,

Exhibit B.  Additionally, the Settlement Agreement does not exclude the GMS fee from the

proceeds of the False Claims Act action and Verizon received a False Claims Act release for the

fee.  *See Quorum*, 171 F. Supp. 2d at 1331 (refusing to exclude $ 5 million from proceeds because

---

[4] The DOJ Relator Share Guidelines also support a 22% share award.  Starting from mid range of 20%, nine out of fourteen factors weigh in favor of increasing Mr. Shea's award (Guidelines 1-3, 5-9, 11 & 14), and only one factor arguably weighs against (Guideline 9).  It is clear that a 22% Relator award is eminently reasonable and supported under both the statutory "substantial contribution" standard and the DOJ Guidelines.

settlement agreement did not segregate that amount and Government did not present evidence of separate nature of claim).  There can be no serious question that Relator is entitled to a share of the $1.3 million GMS fee.

In addition, Relator is entitled to a share of the $ 3 million recovered in 2008 for State Universal Fund Surcharges refunded.  SUSF Surcharges had been named expressly as an illegal surcharge in Relator's January 2007 Complaint.  Dkt. 1 ¶ 75.  By the time of the recovery of SUSF in 2008, the Government had interviewed Relator at least twice and was well aware of the allegations in the Complaint.  Even though not part of the 2011 FCA settlement, the $ 3 million refunded is subject to a relator's share claim under the "alternative remedy" provisions of the False Claims Act, 31 U.S.C. 3730©(5).

## CONCLUSION

For the reasons presented herein, Relator respectfully requests that this Court enter an order awarding him a 22% share of the $96.5 million proceeds in this action including a share of the over $1.3 million GMS Fee and the $3 million collected by GSA in 2008 for State Universal Fund Surcharges.

Dated: July 27, 2011   By:   /s/ Colette G. Matzzie
          Mary Louise Cohen
          DC Bar # 298299
          Colette G. Matzzie
          DC Bar # 451230
          PHILLIPS & COHEN LLP
          2000 Massachusetts Ave, N.W.
          Washington, D.C.  20036
          Telephone: (202) 833-4567
          Fax: (202) 833-1815

          Attorneys for Plaintiffs/Relators Stephen Shea and
          2Probe LLC