## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| *ex rel* **STEPHEN M. SHEA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 07-111 (GK)** |
| | : | |
| **VERIZON COMMUNICATIONS, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

On January 17, 2007, the Relator, Stephen M. Shea ("Relator" or "Shea"), filed the pending False Claims Act Complaint alleging that MCI/Verizon ("MCI" or "Verizon") was submitting false claims for illegal surcharges on invoices submitted under two telecommunications contracts between the United States and Defendants ("FTS 2001" and "FTS 2001-Bridge Contract"). On February 18, 2011, the United States intervened and settled the action for $93.5 million (including accrued interest), thereby resolving the allegations of fraud made in Relator's Complaint. In April, 2008, the Government recovered an additional $3 million for State Universal Fund Surcharges ("SUFS") which were included in the Complaint's allegations.

When it became clear that the Government and the Relator could not agree on the Relator's share of the attorneys' fees, the Government paid the Relator $13,725,000 (about 15% of $91.5 million) as an advance on the ultimate share he would be awarded by the Court. On July 27, 2011, the Relator filed a Motion for Relator Share Award, requesting an additional $7,480,000, for a total award of over $21 million (about 22% of $96,525,411). Upon consideration of the Motion, the Government's Response, the Relator's Reply, the exhibits submitted by the Parties, and the entire record, the Court concludes that the Motion should be **granted in part and denied in part;** Relator

is entitled to an award of 20% of his share of the settlement reached in February 2011, and 15% of

the $3 million refund paid by Verizon to the Government in 2008 for the State Universal Fund

Surcharges alleged in his Complaint.

## I.      PROCEDURAL BACKGROUND

Relator is a former managing director of TechCaliber LLC, a leading consulting firm for

helping clients manage investments in telecommunication services and network infrastructure.  For

18 years, Shea specialized in negotiating telecommunication contracts for large commercial clients

and helping manage the costs of those contracts.  Many of his clients were Fortune 100 companies.

Shea Decl. ¶ 4.[1]  Prior to filing the present Complaint, Shea had been responsible for collecting more

than $50 million in overcharges for his clients from telecommunication carriers.  Id. ¶ 5.  While

working for his private clients, which involved investigation of MCI's (later Verizon's) billing

practices, he discovered the false and fraudulent claims that formed the basis of this Complaint.  Id.

¶ 7, 8.  Based on that investigation, his analysis of the two Government contracts in issue in this case,

and the expert knowledge he had acquired over the years working in this particular area, Shea filed

the present Complaint on January 17, 2007.[2]  Id. ¶ 9-15, 18-20.

As is common in False Claims Act cases, Shea, with the very experienced *qui tam* counsel

he hired, began meeting with the Government in order to persuade it to intervene.  After numerous

---

[1]      The Government did not dispute any of the facts, as opposed to the conclusions, contained in the Shea Declaration.

[2]      Prior to managing TechCaliber, Shea had worked as a Senior Manager in Deloitte Consulting's networking practice where he managed a number of Custom Network Service Agreement projects.  In that capacity, he developed his expertise in competitive analysis of tariffed and negotiated rates.  He has a Bachelor of Science in Engineering Management from the United States Military Academy and a Master of Business Administration from Columbia University.  Id. ¶ 6.

meetings and submission of substantial factual information and legal memoranda in late 2009, Shea and the United States began serious discussions about liability and, eventually, damages. These discussions continued for many months until March 2010, resulting in the Government's intervention in February, 2011, and final settlement of the case.

## II.   ANALYSIS

### A.   Overview of the False Claims Act

The False Claims Act ("FCA"), as amended in 1986, provides that relators, whose successful complaint produces financial gains for the federal Government, shall receive financial awards between 15% and 25% of the final settlement amount. A relator must receive the 15% minimum "even if that person does nothing more than file the action in federal court," and that 15% share is generally viewed as a finder's fee. 132 Cong. Rec. H-9382 (Daily Ed. Oct. 7, 1986, Statement, R. Berman); United States v. Stern, 818 F. Supp. 1521, 1522 (M.D. Fla. 1993). It is well established that the statute's *qui tam* provisions are designed to encourage individuals with knowledge of fraudulent activities against the Government to bring that knowledge to the Government's attention and, ultimately, to public view. U.S. *ex rel.* John Doe v. John Doe Corp., 960 F.2d 318, 321 (2d Cir. 1992).

The relator's share of an award shall be based upon "the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). Percentage awards above the statutory 15% take into account whatever information, work, and help of any kind the relator provides, apart from the mere filing of the action, that leads to a recovery by the Government and substantially contributes to the prosecution of the case without harming the Government's efforts. District courts possess great discretion in making this award because of the

complexities of many of the cases, the great variation in their factual settings, and the desire of Congress, in enacting the legislation, to reward the relators for their contribution to the success of the case.  United States ex rel. Merena v. Smithkline Beecham Corp., 52 F. Supp. 2d 420, 449 (E.D. Pa. 1998), rev'd on other grounds, 205 F.3d 97 (3d Cir. 2000).

In U.S. ex rel. Alderson v. Quorum Health Group, Inc. ("Quorum"), 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001), the district court set out in great detail the various factors which courts have considered in making the award.  Quorum relied on those "sensible considerations" which emerge from the FCA's legislative history, the internal guidelines established by the Department of Justice, and the case law.  While none of these factors binds a district court, taken together they present extremely useful and appropriate criteria for the court to consider in determining an appropriate fee award.

The legislative history of the Senate version of the 1986 amendments to the FCA, which significantly enhanced a relator's portion of her FCA recovery, identified the following factors a court should consider in determining the relator's share: the significance of the information provided by the relator, the relator's contribution to the final outcome, and whether the Government previously knew such information.   S. Rep. No. 99-345, at 28 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5293 ("the Senate factors"); U.S. ex rel. Johnson-Pochardt v. Rapid City Regional Hosp., 252 F. Supp. 2d 892, 897-98 (D.S.D. 2003).

### B.    The Senate Factors

#### 1.    Relator's Contribution of  Significant Information

Relator Shea is correct when he states that the "allegations I made in the Complaint filed in 2007 were the template for the overcharges recovered by the Government in this action."  Id. ¶ 21.

The February 2011 settlement agreement provided that Verizon would receive a release of claims (in exchange for $93.5 million) for surcharges listed as "covered conduct."  All the charges listed as "covered conduct," with one exception, are the same surcharges that Shea identified in 2007 when he filed his Complaint.  Id. ¶ 22.

Over 80% of the $91.5 million recovery was from two specific categories of surcharges, both of which Shea had urged the Government to prioritize and focus on in the investigation it started in 2007.  Id.  They were the Ad Valorem Property Taxes and the Federal Regulatory Fees/Common Carrier Recovery Charges ("Federal Regulatory Fees Charges").  Id.  From the very beginning, Shea directed the Government to focus on these two surcharges, thereby enabling the Government to save enormous amounts of lawyer time, auditor time, and other staff time on charges which were of far lesser significance.

Not only did Shea save the Government a great deal of time and resources and contribute to obtaining a substantial settlement, it is certainly more than likely that without this lawsuit, Verizon would have continued to overcharge the United States indefinitely, i.e., as long as it could get away with it.  Id. ¶ 25.

In July of 2007, the Government requested the Relator to "set forth in a separate memorandum our position on why each surcharge [he identified] was prohibited under the Federal Acquisition Regulations ("FARs") and the contract and that we rank in priority the charges for investigation." Id. ¶ 26.  In response, Shea and the experienced FCA attorneys he had hired, worked over a two week period to present the Government with the chart it had requested and a legal memorandum setting forth the factual and legal basis for the allegations about each surcharge. Id. ¶ 27.

That memorandum also emphasized that the Government should investigate, as its first priority, the ad valorem and Federal Regulatory Fees surcharges. <u>Id.</u> In addition to saving the Government enormous resources, the legal memorandum and chart also helped the Government's auditors to identify relatively quickly the ad valorem charges in Verizon's back-up billing data. That recognition provided a further incentive for the Government to continue its investigation. <u>Id.</u>

Thereafter, the Relator worked with the Government, through counsel, to draft proposed categories for subpoenas to be issued against Verizon enabling the Government to issue subpoenas to Verizon which focused on evidence of *scienter* within the company. <u>Id.</u> ¶¶ 27, 29. Shea also identified former MCI employees as potential witnesses and provided detailed information about how Government contracts were administered by MCI. <u>Id.</u> ¶ 38.

In addition to providing the legal services of a very knowledgeable and experienced FCA law firm, Phillips & Cohen, LLP, Shea retained Douglas Jarrett of Keller Heckman, LLP, who specialized in telecommunications law to assist his FCA counsel. <u>Id.</u> ¶ 30. Jarrett is a leading telecommunications attorney who represented domestic and foreign corporations and state and local governments before the Federal Communications Commission on Wireless Telecommunications and Media policy, licensing and enforcement matters. Thus, Shea was able to contribute not only his own experience and expertise, but that of a FCA law firm and a specialist in telecommunications law. <u>Id.</u>, ¶ 30.

Shea participated fully in all aspects of the Government's investigation and settlement discussions with Verizon, and estimates that he spent hundreds of hours each year on the case, including pre-filing time. <u>Id.</u>, ¶ 31. Shea even agreed, at the Government's request, to sign a Non-

Disclosure and Confidentiality Agreement, so that he could have access to the findings of the GSA audit team and analyze their usefulness to the litigation.  Id.

In late 2009, when Verizon and the United States were beginning serious discussions about liability, as well as damages, Shea reviewed a November, 2009, PowerPoint presentation which Verizon had used to present its defenses to the United States.  Id. ¶ 33.  In doing so, Shea worked closely with his counsel at Phillips and Cohen, as well as Douglas Jarrett, to respond to all the substantive arguments Verizon made denying its liability.  On December 7, 2009, Shea and his counsel made a multi-hour presentation to the Department of Justice, identifying significant mischaracterizations made by Verizon and explaining in detail why certain surcharges, which the Government had excluded, should be included in its analysis of damages.  Id., ¶ 33.

By virtue of Shea's analysis of Verizon's defenses, he and his counsel were able to convince the Government that in addition to Verizon being liable for illegal ad valorem property taxes surcharges and other franchise surcharges that are expressly excluded under the FTS 2001 contract and FARs, there was no justification for Verizon charging the Government for the Federal Regulatory Fees Charges.  Moreover, the charges in this particular category had been escalating over time at increasingly high percentages.  Id., ¶ 35.

### 2.    Relator's Contribution to Final Outcome

See Section II. C. 6, 8 and 11, infra.

### 3.    Prior Government Knowledge of Relator's Information

The Senate also indicated that the extent of the Government's knowledge of the information provided by a Relator should be considered in determining her portion of the attorneys' fees.  In this case, the Government had no recognition, prior to the filing of this lawsuit, that the surcharges --

especially the ad valorem and the Federal Regulatory Fee charges -- were illegal under the FARs and the contracts, and that therefore there was absolutely no justification for their payment.  Id. ¶ 24, 25. Nor did the Government understand the manner in which MCI/Verizon administered the Government contracts.  While it is true that the General Services Administration ("GSA") had a team of auditors who routinely reviewed the invoices under the FTS 2001 Contract, in almost a decade of auditing that contract, GSA had not previously identified the particular overcharges Shea identified, nor even audited that section of the invoice or contract.  Id. ¶ 24, 25.

### C.    Department of Justice Guidelines

In December of 1996, the Department of Justice issued a set of "Relator's Share Guidelines" ("DOJ Guidelines" or "Guidelines").  See 11 FCA and Qui Tam Quarterly Review at 17-19, Oct. 1997, which were developed to offer assistance to DOJ attorneys "[w]hen trying to reach agreement with a Relator as to his [or her] share of the proceeds, or proposing an amount or percentage to the court. . . ."  Id.  While these Guidelines are not official federal regulations, and therefore not binding on the Court, they are often considered when district courts are deciding on the appropriate percentage of the proceeds to give a relator in an FCA case.  Moreover, the topics they cover are very relevant criteria for in making this decision.  Quorum, 171 F. Supp. 2d at 133-34.  The Court will address them one by one.

### 1.    The Relator Reported the Fraud Promptly

Shea reported the fraud approximately two years after concluding in his own mind that there had been fraudulent conduct by the Defendant.  Shea Decl. ¶ 20.  While ordinarily this would be a significant delay in reporting the fraud, in this case it is not because Shea felt it necessary, due to the

complexity of the issues, to conduct his own careful investigation of the facts and, in particular, to analyze the FTS-2001 contract and the FARs.

During this two-year period, Shea came to understand that the FARs included requirements for firm, fixed-price contracts of the kind that Verizon had with the Government. Id. ¶ 10. Such contracts do not allow price increases on the basis of whatever costs the contractor may incur in performing them. In other words, the contractor takes the maximum risk, as well as full responsibility for all costs and resulting profits or loss. Id.; 48 C.F.R. 16-202-1-16.203-4.

Shea also came to understand that, in general, the United States did not have to pay such charges because of its Constitutional immunity from state and local taxes. Id. ¶ 11. The FARs provide that "the contract price includes all applicable Federal, States and local taxes and duties" unless it explicitly permits separate assessments. 48 C.F.R. 52.229-3-52.229-4. Id. ¶ 12. In the course of his work for his private clients and MCI, Shea realized that MCI/Verizon was imposing the state and local taxes and surcharges on the United States which are not allowed under the FARs. 48 C.F.R. 52.229-3-52.229-4. Id. ¶ 13.

Given the fact that this background investigation by Shea took a great deal of time and research, the two year delay in filing the Complaint was perfectly justifiable. It should also be noted that by the time of filing, Shea was able to provide the United States critical documentation and information which, in many FCA cases, are not available to either the relator or the Government until discovery is well underway.

### 2. When He Learned of the Fraud, the Relator Tried to Stop the Fraud or Reported It to a Supervisor or the Government

As explained above, the Relator reported the fraud to the Government as soon as he was satisfied that he had sufficient documentation and analysis to support such serious charges.

### 3. The *Qui Tam* Filing or the Ensuing Investigation Caused the Offender to Halt the Fraudulent Practices

The record is not clear on this question. Certainly, by the time the settlement was reached in 2011, the fraudulent practices had stopped. However, that cessation was due in substantial part to Relator's bringing information about those practices to the Government.

### 4. The Complaint Warned the Government of a Significant Safety Issue

There was no safety issue of any kind involved in this case.

### 5. The Complaint Exposed a Nationwide Practice

The Complaint did in fact expose a nationwide practice, since the MCI/Verizon contracts with the Government were of national scope.

### 6. The Relator Provided Extensive First Hand Details of the Fraud to the Government

During the course of working for his private clients, Shea learned that MCI had imposed surcharges for property taxes on those clients, as well as the Government, since 1966, and that such surcharges were being used as a hidden source of revenue for MCI. Id. ¶ 13, 16, 17. These surcharges were increasing dramatically each year with no logical relationship to any increase in MCI's actual property taxes. Id. ¶ 8.

Shea also learned from "two MCI insiders" in a position to know about tax and surcharge issues that MCI was not customer specific in imposing its surcharges, and that it had constructed

its billing platform in such a way that it was difficult to turn these taxes and surcharges "on" and "off" for specific customers, such as the Government.  Id. ¶ 8.  He also noticed that in Responses to Requests for Proposals from private clients, MCI included surcharges that would not be permitted under Government contracts (such as the Federal Regulatory Fees Charges which was later renamed the Common Carrier Recovery Charge).  Id.

During the same period of time he was working for his private clients, Shea undertook an analysis of the FTS-2001 contract to determine what categories of surcharges could not, as a matter of both contract and federal law, be imposed on the United States.  Id. ¶ 9.  He concluded that certain key surcharges included charges for property and franchise taxes that could not be imposed on the Government and that Government contracts and Government regulations strictly limited what surcharges could be imposed.  Id.  He also concluded that the MCI/Verizon practice of designating surcharges as taxes, or describing the surcharges as though they were taxes imposed in the transaction or property when they were not, concealed that the charges are not in fact imposed on the customer, but on the carrier itself as its own cost of doing business.  Id. ¶ 15.  In summary, during this pre-filing period, Shea concluded that MCI/Verizon was billing the Government for surcharges as though they were surcharges imposed on the transaction when, in fact, they were seeking to collect back their own costs of doing business, and that MCI/Verizon was attempting to pass on these illegal surcharges to the United States under the FTS-2001 contract.  Id. ¶¶ 15, 17.

Shea based his allegations on an "insider" MCI document he received from an MCI contact that claimed to show "the taxes and surcharges that the federal government was responsible for." Id. ¶ 18.  After reviewing this document, which Shea turned over to the Government after filing his Complaint, he concluded that MCI was imposing far more surcharges than were permitted under the

FTS-2001 contract or the FARs.  Id. ¶ 18.  That MCI document included "a list of taxes that the Government must pay" and included the Federal Regulatory Fees surcharges, state sales, excise and utility taxes, and surcharges based on state and local fees, contributions, and taxes assessed on the carrier itself, state and local gross receipts taxes, business license fees, 911 taxes, tele-relay service charges, ad valorem taxes, and business, occupational, and franchise taxes.  Id. ¶ 19.

Thus, at the time of filing his Complaint, Shea provided the Government with extensive pre-filing research and analysis on what the law, the FARs, and the applicable regulations allowed as surcharges on Government contracts, including the FTS 2001 Contract, as well as a particular MCI document showing that MCI was submitting illegal overcharges to the United States.  Id. ¶ 20.

In July of 2007, Shea and his counsel, at the request of the Government, prepared and provided an extensive chart which listed each surcharge that he believed to be illegal and provided cross-references as to why it was illegal under the contract, as well as the FARs, etc.  Id. ¶ 27.  It was in that document that Shea first emphasized that the Government should prioritize its investigation and focus on two particular surcharges, namely, the *ad valorem*/property surcharge and the Federal Regulatory Fees surcharge.  Id.

As the Government began its own thorough investigation, Shea and his lawyers met with Government lawyers and auditors, and provided additional documentary evidence which was available to him in his capacity as a consulting expert through his partnership in telecommunication tax conferences.  Shea Decl. ¶ 28.  Shea also identified former MCI employees with reliable information who might be witnesses and provided information about Verizon's administration of Government contracts.  Id. ¶ 38.

In November 2009, as Verizon and the United States began serious settlement discussions, Shea and his lawyers made a multi-hour PowerPoint presentation to the Department of Justice identifying and refuting the defenses which Verizon had given to the charges during the Government's investigation.  Id. ¶ 33.

### 7.      The Government Had No Knowledge of the Fraud

It is absolutely true that the Government had no knowledge of the fraud.  While the GSA auditors undoubtedly did their job as best they could, they simply did not have the relevant experience that Shea had in understanding the extremely complex administration of Government contracts.  The General Services Administration auditors, who routinely reviewed the FTS-2001 contract invoices, had never previously identified the overcharges Shea had alleged and had not even audited the relevant section of the invoices or contract.  Id. ¶ ¶ 24, 25.

### 8.      The Relator Provided Substantial Assistance During the Investigation and/or Pre-trial Phases of the Case

There is no question that Shea did in fact provide substantial assistance to the Government after he filed the Complaint.  First, at the beginning of the litigation, he hired experienced *qui tam* counsel who, along with Shea himself, worked very closely with the Government throughout its investigation, prepared a detailed legal memorandum for the Government justifying the illegality of each of the surcharges listed in the Complaint, and helped the Government draft proposed subpoena categories once it began informal discovery.  Shea also hired Douglas Jarrett, a telecommunications lawyer, to aid the Government's investigation.  Shea and his counsel presented a 40-page, two hour power point presentation to the Government to rebut Verizon's denial of liability.  Id. ¶ 33.

Finally, Shea himself spent hundreds of hours on the case, both pre-filing and post-filing. He met with Government counsel and investigators in Washington, D.C. more than 10 times. On numerous occasions, he discussed with the GSA auditors the methods they were using to identify illegal surcharges and had several conference calls in 2009 with them. He aided and participated in every Status Conference the Court held. He signed a Non-Disclosure and Confidentiality agreement, as requested by the United States, so that he could be aware of and help analyze the findings of the GSA audit team regarding the types and amounts of overcharges it identified.

**9.      At His Deposition and/or Trial, the Relator Was an Excellent, Credible Witness**

There was no deposition or trial in this matter. However, given the initial materials Shea gave the Government and the on-going help he gave the Government lawyers and its auditors throughout the Government's investigation, one can only infer that the Government had concluded that he was indeed credible. There is nothing in the record to cast doubt on his credibility.

**10.      The Relator's Counsel Provided Substantial Assistance to the Government**

This has already been adequately described and the assistance of counsel was, indeed, substantial.

**11.      The Relator and His Counsel Supported and Cooperated With the Government During the Entire Proceeding**

As is obvious from all the material already cited, the Relator and his counsel provided extensive support and cooperation to the Government during the entire proceeding. During settlement discussions between the Government and Verizon, Shea and his counsel assembled their best estimate of the damages for the illegal surcharges. At that time, they estimated that the illegal

*ad valorem*/property taxes alone would yield approximately $81 million in damages over a 10-year period.  Id. ¶ 36.  Thereafter, the Government provided Shea with its estimate of damages broken down by each surcharge category.  Id. ¶ 37.  He was able to immediately identify an additional category of damages that the Government had not yet identified (the Federal Universal Service Fund) that was applied on top of the illegal surcharges.  This charge alone accounted for over $5 million in the settlement.  The Government does not deny that it had not originally included this charge in its original damages estimate.  Id. ¶ 37.

During the spring of 2010, Shea also attempted to focus the Government on recouping other franchise tax fees that Verizon was illegally charging.  Id. ¶ 39.  For the next several months, Shea and his counsel reviewed all the franchise taxes and gave the Government an in-depth analysis of which charges were improperly imposed under the terms of the FTS-2001 contract.  Id.  This analysis required many hours to prepare and among other things required exhaustive review of dozens of state and local ordinances governing the franchise surcharges to determine whether they were being properly charged.  The analysis also involved surcharges that did not relate to any jurisdiction at all and therefore could not be submitted to the United States, charges that were imposed more than once, and other taxes not listed in the table in B.1.2, Vol. IV of the FTS-2001 Contract.  As a result of this work, on June 3, 2010, Shea and his counsel sent the Government an analysis, which the Government deemed reasonable, setting forth dozens of additional improper tax surcharges.  Id. ¶ 40; Matzzie Decl., Exh. C.

Shea continued to work with the Government in the summer and fall of 2010 while it was engaged in settlement negotiations with Verizon, in order to convince the Government to not concede various issues.  Id. ¶ 41.  In September, 2010, Shea was forced to ask this Court to enter an

Order, which was granted, directing GSA and the Department of Justice to share the Government's underlying damages estimate with him so that he could analyze the methodology used.  Id.

It became clear that there was disagreement between Shea and the Government on the damages figure to be accepted in the settlement with Verizon.  Shea reluctantly decided to accept the Government's damages figure so that a final definitive settlement could be reached, although he believed that there were valid additional claims that could be made under the FTS-2001 contract. By agreeing to the settlement, he was giving up potential additional fees that he could gain from a higher settlement figure.  Id. ¶ 43.

### 12.   The Case Went to Trial

It did not go to trial.

### 13.   The FCA Recovery Was Relatively Small

The Court does not consider a $96.5 million recovery (the original $93.5 million settlement agreement plus the $3 million recovered for the SUFS charges) to be "relatively small."  In addition to the $96.5 million recovery, the Government saved what would clearly have been continuing overcharges.

### 14.   The Filing of the Complaint Had a Substantially Adverse Impact on the Relator

In this case, the filing of the Complaint, along with all the pre-filing investigation the Relator did and the post-filing assistance that he and his counsel gave the Government, did have a substantial adverse impact on him.  To begin with, Shea felt it necessary to terminate his involvement with TechCaliber, where he had been earning $1-$2 million a year as a consultant, once he decided to hire counsel and adequately investigate this case so that it could be filed.  Id. ¶ 23.  He paid more than

-16-

$500,000 to terminate the TechCaliber partnership and his position as Managing Partner of TechCaliber.  Id.  In addition, he invested many hundreds of hours,[3] as detailed above, completing his pre-filing investigation, and participating with and assisting the Government during its investigation and the lengthy settlement phase of the case.

He hired False Claims Act specialists as counsel who spent over 1,200 hours of attorney and paralegal time.  Rel. Mem. in Support of Mot. at 3.  That work included extensive legal research regarding the interpretation of FTS-2001; review of all documents provided by Shea; drafting, filing, and service of the Complaint; interviews with the Relator; and many additional meetings and telephone calls from 2007-2010 with the Government lawyers, investigators, auditors, and members of the professional staff from the United States Attorney's Office, the Department of Justice, and the General Services Administration.  On at least two occasions Shea's lawyers presented lengthy substantive legal memoranda and/or charts to the Government.

Shea played a substantial role in settlement negotiations.  When he and the Government disagreed on certain damages issues, he allowed the Government to settle the case for less than he thought was possible so as to facilitate a final settlement between the Government and Verizon on the terms they had agreed to.  Id. ¶ 43.

In summary, Shea lost the earnings he could have made during a period from 2005-2011; his share of the greater recovery he firmly believed the Government was entitled to; the payment of counsel fees and costs during that six-year period when he was not earning consulting fees (which

---

[3]        Shea estimates he spent hundreds of hours each year working on the case.  Id. ¶ 31.

have now been reimbursed by Verizon);[4] and of course the hundreds of hours he spent working on the case.

Finally, while the amount sought in this case is very substantial, it does not exceed the one-third of the total recovery which whistleblowers generally obtain in private industry.  Id. ¶ 45.

### 15.    DOJ Guidelines for Consideration of a Decrease in the Percentage Awarded the Relator

DOJ also issued a list of items that should be considered for decreasing a percentage sought by a Relator.  They are:

(1)    The relator participated in the fraud.

(2)    The relator substantially delayed in reporting the fraud or filing the complaint.

(3)    The relator, or relator's counsel, violated FCA procedures:

(a) complaint served on defendant or not filed under seal.

(b) the relator publicized the case while it was under seal.

(c) statement of material facts and evidence not provided.

(4)    The relator had little knowledge of the fraud or only suspicions.

(5)    The relator's knowledge was based primarily on public information.

(6)    The relator learned of the fraud in the course of his Government employment.

(7)    The Government already knew of the fraud.

(8)    The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's position in litigation.

---

[4]    Counsel in this case have already been paid, pursuant to 31 U.S.C. § 3730(d)(1), the fees and costs to which they are entitled.  That amount has not been disclosed by the parties.

(9)     The case required a substantial effort by the Government to develop the facts to win the lawsuit.

(10)     The case settled shortly after the complaint was filed or with little need for discovery.

(11)     The FCA recovery was relatively large.

With two exceptions, not a single one of those considerations apply to this Relator in this case.  As to item 9, it is true that despite the substantial contribution that Relator provided to the Government, the Government itself had to put in substantial effort to develop the facts to both rely on Relator's analysis, and to prevail in this lawsuit.  The complexity and extent of the factual materials required such effort.  As to item 11, the False Claims Act recovery was, as discussed earlier, not relatively small.  On the other hand, it was not overwhelmingly large.

**D.     The Government Responses**

The Government argues that Relator should receive 16% of the $9l.5 million recovery; that he should receive 15% of the $3 million recovery paid in 2008 for the State Universal Fund surcharges, and that he should receive nothing for the $1,322,248 GSA Management Services fee ("GMS") recovery.  The Court will address each of these arguments in turn.

First, as to the appropriate percentage to be paid the Relator for the total recovery which will exceed $93 million at a minimum, the Government basically argues that the Relator did not substantially contribute to the prosecution of this lawsuit.  Significantly, as noted earlier, the Government does not dispute any of the facts offered by the Relator to demonstrate the nature and extent of his participation in the lawsuit.  Rather, the Government complains that Relator had no first hand knowledge of the billing practices of MCI/Verizon under the FTS-2001 contracts.  The Government argues that all the Relator provided in his Complaint was "an assumption that Verizon

billed the Government for taxes and surcharges similar to how it billed its commercial customers" and that Relator's Complaint was "a guess, an educated guess, but a guess nonetheless that the Defendant was billing the Government for unallowable costs." Govt. Resp. at 5.

This is a profoundly unfair characterization of the nature and extent of the expertise, experience, knowledge, analysis, and just plain hard work that Shea, and his lawyers, contributed to this litigation. In considering the different factors in the Department of Justice Guidelines, *supra*, the Court has outlined in some detail the types of assistance that Relator and his counsel gave the Government. The Relator certainly does not deny that the Government itself put much effort into this litigation, but it is just not accurate to say that all that Relator provided was "an educated guess."

The Government makes much of the fact that the case was settled while still under seal, before it intervened, and without a trial. However, the case law is clear that Relators may deserve a substantial percentage of the recovery even though no trial is necessary. See U.S. *ex rel.* Pedicone v. Mazak Corp., 807 F. Supp. 1350 (S.D. Ohio 1992), overruled on other grounds, 69 Fed. Appx. 719 (6th Cir. 2003); U.S. *ex rel.* Johnson-Pochardt, 252 F. Supp. 2d at 903. Indeed, as a practical matter, the stronger the case and the more compelling the evidence at the time of filing and/or after discovery is completed, the less likely it is that a defendant will take the risk of treble damages and civil penalties being awarded at trial, to say nothing of the time and expense of trial itself. See Quorum, 171 F. Supp. 2d at 1334 n. 34.

The Government also argues that Relator's provision of "insider" MCI documents was not nearly as significant as Relator believes. According to the Government, the MCI document in question, known as the Contract Data Requirements List 0197 ("CDRL"), dated April 22, 2005, containing the list of taxes and surcharges, had been provided to the Government by the Defendant

in an earlier submission which was required under the contract.  For this reason, the Government

contends that Relator's "insider" document, which he believes was so critical to the success of this

litigation, did not, in fact, disclose any information that was not already in the Government's

possession.  However, the Government misses the point.  It may well have had the CDRL in its

possession, but it had no understanding of what it meant, how it should be interpreted, or its

relationship to fraudulent billing by Verizon until the Relator explained its significance.

The fact that the Government itself had to carry out an extensive detailed investigation of the

allegations, if only to confirm the accuracy of Relator's charges, in no way minimizes the value and

contribution of the knowledge, analysis, and legal justifications that Relator brought to the litigation.

In addition, at different times, Relator identified specific individuals who would be effective and

knowledgeable witnesses at trial and additional sources of information to the Government.

The Government also argues that the Relator did not provide any particulars of the general

billing scheme, the "'who, what, when, where, and how' of the alleged fraud." U.S. *ex rel*. Willard

v. Humana Health Care of Texas, 336 F.3d 375, 384 (5th Cir. 2003); Govt. Resp. at 4.  However,

the Government concedes three sentences later that "[t]he absence of such details is not surprising,

as Relators were not privy to information about Defendant's contracts with GSA or other

Government agencies." Id. at 5.  Once again, there is nothing unusual about this scenario.  FCA

cases, as every trial judge knows, often take years to come to fruition because of the extensive

investigation and discovery that is almost always required.

The Government also argues that the Relator's share of the proceeds depends upon the extent

of his contribution to the case rather than the contribution of his counsel.   The case law does not

support any such statement.  Even though the FCA provides separately for the recovery of reasonable

attorneys' fees, expenses, and costs, the Government's argument has been rejected in both <u>Quorum</u> and <u>Johnson-Pochardt</u>. The case law indicates that a Relator should be compensated for all of the ways in which his investment of time, resources, information, and assistance contributed to the Government's recovery.

The GSA declarant states that the agency first became aware that the Government paid such overcharges between July, 2003 and April, 2005, in the course of investigating fraud allegations made in an earlier filed *qui tam* action that MCI settled with the Government in 2004 for $27.6 million. McKenzie Decl., September 19, 2011, ¶ 2. That investigation, which examined Interexchange Carrier Charge Fees, was referred to as the "PICC review."

However, it was only in 2007, because Relator and his counsel specifically directed the Government to review its PICC files to see if it had obtained evidence of the overcharges during that investigation, that the Government began to pay attention to whether it had evidence of the overcharges in the PICC documents. Shea Suppl. Decl. ¶ 5-7. Thus, even though GSA had the relevant documents demonstrating overcharges in its possession since 2003, it was not aware of the documents' significance, never audited them, other than what was necessary for the PICC settlement, and never sought refunds from MCI/Verizon before the filing of this litigation. In short, GSA had not figured out the fraudulent nature of the overcharges even though it had possession of the relevant documents and Relator is correct that "[t]here is no indication that GSA would have understood the significance of the documents in its files without Relator." Relator Reply at 5; Shea Suppl. Decl. ¶ 7.

To summarize, the Government has failed to undermine or rebut Relator's contention that he made a substantial contribution to recovery of the $91.5 million amount. Not only was his

contribution substantial, but it is doubtful that the Government would ever have become aware of the scheme or understood it without Relator's experience, explanations, and guidance.

Second, the Government concedes that the Relator should receive 15% of the $3 million payment for the SUSF credit.  Relator asks for 22%.  However, Verizon unilaterally disclosed and repaid this amount to the Government.  Although the Relator included this charge in his Complaint, he has not made any substantial contribution to its recovery.  Therefore, the absolute minimum of 15% is an appropriate award.

Third, the Government objects to including the GMS fees recovery as part of the overall settlement.  The GMS fee was not explicitly identified in the Complaint and it was Verizon who, in 2008, notified GSA of the billing practice.  The GMS fee was first brought to the Government's attention in a July 2008 letter from Verizon.  Therefore, that fee was not an integral part of the Relator's Complaint.  See U.S. ex rel. Bledsoe v. Community Health Sys., Inc., 501 F.3d 493, 522 (6th Cir. 2007).  In Bledsoe, the Court of Appeals held that the Relator was not entitled to share in the Government's recovery of a particular claim because the qui tam complaint did not "concern the . . . [particular] codes covered in the settlement agreement."  Id. at 523.  In short, there must be some "findings of [factual] overlap" between the qui tam claims and the Government claims before a private Relator has a right to recover a share of the Government's proceeds.  No such overlap has been demonstrated in this case.

Therefore, the Relator may not share in the $1,322,248 GMS fee recovered by the United States.

**III.    CONCLUSION**

For all the foregoing reasons, the Court concludes that Relator has substantially contributed to the prosecution of this case and recovery of more than $93.5 million.  Based on all the criteria which the Court has discussed, Shea "deserves a robust share of the settlement proceeds."  Quorum, 171 F. Supp. 2d at 1332.  Without his experience, guidance, and analysis, the fraudulent conduct might well never have been discovered and understood; worst of all, it would very likely have continued far into the future.  Therefore, Relator is entitled to 20% of the $93.5 million of the recovery, and 15% of $3 million of the recovery.

February 23, 2012                              /s/_____
                                               Gladys Kessler
                                               United States District Judge